[Crim. No. 7577. In Bank. July 16, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS LEROY TEALE and RUTH ELIZABETH CHAPMAN, Defendants and Appellants.

Nels B. Fransen, Thomas R. Krchbiel and Richard E. Johnson, under appointment by the Supreme Court, and Simonelli & Fransen for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

PEEK, J.—Defendants Thomas L. Teale and Ruth Eliza-

beth Chapman were convicted by a jury of the first degree murder of Billy Dean Adcock, robbery of the first degree and simple kidnaping. A life sentence was imposed upon the defendant Chapman as to the murder count and she appeals from the whole of the judgment. The death penalty was imposed upon the defendant Teale, and his appeal is automatic pursuant to the provisions of section 1239, subdivision (b) of the Penal Code. The order denying defendants' motion for a new trial being nonappealable, the defendant Chapman's purported appeal therefrom must be dismissed. (Pen. Code, § 1237.)

On October 17, 1962, defendants registered at a motel in Fresno, where they gave a bad check in payment of their room rental. At approximately 10 p.m. on that same day they entered a tavern near Lodi where they remained for nearly three hours and together consumed five bottles of beer. Mrs. Chapman went outside for awhile and upon her return was heard to say to Teale: "Let's go, we are not going to do anything here," or "We can't do anything here, let's go." They then left the tavern together.

Defendants next appeared at about 2 a.m. the following day at the "Spot Club" in Lodi. The only persons in the bar at that time were the defendants and Adcock, the bartender. Shortly thereafter three persons, including the bartender and a woman of Mrs. Chapman's general description, were observed in front of the Spot Club. The third person in the group, a man resembling the defendant Teale in general appearance, was standing behind the bartender, who apparently was locking the door of the tavern.

The following morning the owner of the bar found it to be in unusual disarray. The cash register had been broken into and approximately $260 was missing. Papers usually kept in the register were scattered about the floor. Routine housekeeping tasks which the bartender generally completed before leaving had not been performed.

Later that morning the victim's body was found in a remote area north of Lodi. It was half submerged in an open ditch by the side of a road. The clothing was torn and there was blood on the face and on the surface of the road nearby. The victim had been shot three times in the head, two bullets apparently penetrating through the same wound on the left side of the head from a gun held as close as two inches. The third bullet entered the back of the head from a gun held

some 18 inches away. The time of death from the gunshot wounds was estimated at 3 on the morning of the 18th.

The bullets which inflicted the deceased's wounds were fired from a .22 caliber weapon similar to a gun purchased by the defendant Chapman in Reno, Nevada, while there with Teale six days before the killing. Neither the gun which she purchased, nor the gun which fired the fatal bullets was located.

Numerous items of personal property were found in the vicinity of the body, including the victim's wallet from which $50 to $65 in cash had been removed, and a check for $2.00 bearing a stamp "Refer to Maker," which had been signed by Mrs. Chapman.

Evidence connecting defendants with the commission of the crime was submitted by an expert witness for the People who testified that the victim's blood was Type A; that Type A blood was found on the right side of the front floor mat, spattered on the overhead fabric liner, the dome light and clothes rack in the back of defendants' vehicle; that blood had spattered or radiated out from the right front side of the automobile; that Type A blood was found on Mrs. Chapman's fur stole and spattered on a dress, blouse, skirt and shoes in her possession; that Type A blood was also found on defendant Teale's shirt and jacket; that numerous fibers taken from the victim's shoes matched those found in the defendants' automobile, that hairs were found in the automobile which matched those of the victim; that red paint found on the floor mat of the defendants' automobile came from the shoes of the victim, and that in the opinion of the expert the victim had been in the defendants' automobile.

Defendant Teale was arrested in New Orleans on November 2, 1962. At that time he carried a gun which had been purchased by Mrs. Chapman in Reno on the same day on which she purchased the .22 caliber weapon hereinbefore mentioned, and he was driving the automobile which had been in the defendants' possession before and at the time of the killing.

After his return to California Teale was confined with one Waldo Vowel, another prisoner, who testified as to a conversation he had with Teale wherein Teale stated that "he hoped Mrs. Chapman did not break down and start saying anything, because they didn't have anything on them yet." Later, the witness testified, he had another conversation with Teale in the prison yard: "I told him I knew Bill [the de-

ceased], and he [Teale] told me he didn't plan for it to happen that way, and he started relating to me how it happened. He said that they were arguing over money all afternoon, and he said it was his idea to rob him and said he was going to take him out in the country and just run him off up through the vineyard, or something like that, but had no idea of killing him. But he said when they pulled up and stopped, that he opened the door, he didn't say who was driving or nothing, just said when they stopped that he got out to go around—go around to the other side of the car to get Adcock out, and said that Mrs. Chapman shot him once in the back of the head, and then said when he fell, before he could get around the car, he said she shot him two more times.''

Teale further stated, according to the witness, that ''they'' would never find the gun. In response to a question as to any statements Teale might have made regarding expected punishment, the witness stated: ''Well, he said out there in the yard, he said if they had anything on him, he said he was going anyway, and he didn't want Mrs. Chapman to 'cop out' or anything, because he said if she didn't, you'd have to prove which one of them done it. Said he was going anyway, it didn't make any difference. So he said if she just kept quiet that she might get off with just seven or eight years.'' The foregoing testimony of conversations had with Teale was received under an admonition that the jurors could consider it only as to Teale. No claim is made and the record does not disclose that Teale's fellow prisoner was acting in complicity with the state.

Mrs. Chapman was arrested by an agent of the Federal Bureau of Investigation in St. Joseph, Missouri, on October 26, 1962, and thereafter gave conflicting accounts to the officer of her whereabouts on October 17 and 18. She stated first that she had been in Ukiah from the 17th to the 20th of October, on which latter date she left by bus for St. Joseph. She later stated that on the evening of the 17th and early morning of the 18th she had waited in a bus depot in San Francisco. However it was stipulated at the trial that a registration card for occupancy of a motel room by a ''Mr. and Mrs. T. L. Rosenthal'' in Woodland at 4:40 a.m. on October 18, was made out in her handwriting. The clerk of the motel also testified that the registrant gave a false license number, and that the automobile in which the parties arrived was the one found in Teale's possession upon his arrest.

The record is mute as to the factual basis for certain of the requirements which must be satisfied before testimony of Mrs. Chapman's statements could have been properly introduced by the prosecution. However, the conflicting testimony relative to her whereabouts on October 17 and 18 was elicited on direct examination from the federal agent appearing as a witness for Mrs. Chapman. On cross-examination the officer testified, relative to the conflict in her statements, that she denied she suffered from "blackouts."

Neither defendant appeared as a witness.

Mrs. Chapman's first contention, that she was denied her constitutional right to a speedy trial, is not borne out by the record. She voluntarily waived the 60-day limit (Pen. Code, § 1382, subd. 2) and trial was set for February 5, 1963. On that date appointed counsel, the public defender, withdrew due to a conflict in interest in his representation of both her and the defendant Teale. New counsel appointed for Mrs. Chapman on February 5 instituted discovery proceedings and trial was postponed until March 19, presumably in the defendant's interest. (*People* v. *Donohoe,* 200 Cal.App.2d 17 [19 Cal.Rptr. 454].) Prior to the March 19 trial date Mrs. Chapman filed an affidavit that the public defender's prior representation of her would prejudice her right if a joint trial was had, and the court permitted the public defender to withdraw as counsel for Teale also. New counsel was appointed for Teale and trial was again postponed, to give such counsel an opportunity to prepare, until April 16, when trial was had.

Where a continuance is granted upon good cause to a codefendant the rights of the other defendants are generally not deemed to have been prejudiced. (*People* v. *McFarland,* 209 Cal.App.2d 772 [26 Cal.Rptr. 596]; *Ferenz* v. *Superior Court,* 53 Cal.App.2d 639 [128 P.2d 48].) Moreover, assuming without concluding that there was an improper denial of a speedy trial, the error must be prejudicial to merit a reversal therefor. (*People* v. *Wilson,* 60 Cal.2d 139, 152 [32 Cal.Rptr. 44, 383 P.2d 452].) Although Mrs. Chapman asserts that the delay caused her an emotional upset which persuaded her not to testify in her own behalf she still fails to show how her testimony would have aided her cause.

Both defendants contend that the evidence is insufficient to justify the verdicts. The defendant Teale further contends that the evidence presented to the grand jury failed to establish reasonable or probable cause to hold him to answer for

the crimes charged. Teale unsuccessfully moved in the trial court to set aside the indictment on grounds of insufficiency (see Pen. Code, § 995), and his petition for prohibition upon the ground that the indictment was found without reasonable or probable cause was denied by the District Court of Appeal (see Pen. Code, § 999a). ▉ The evidence before the grand jury was substantially the same as that herein recited other than that of the People's expert witness and the fellow prisoner to whom Teale made certain admissions. ▉ We recently stated in *People* v. *Ketchel,* 59 Cal.2d 503 at page 532 [30 Cal.Rptr. 538, 381 P.2d 394] : " 'Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344].) An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the *possibility* that an offense has been committed and the accused is guilty of it.' (*Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 183-184 [281 P.2d 250], emphasis added; see also *Weber* v. *Superior Court* (1950) 35 Cal.2d 68, 69 [216 P.2d 871].) ▉ 'If there is some evidence to support the indictment, the courts will not inquire into its sufficiency. . . .' (*Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 55 [216 P.2d 859]; *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713].)"

▉ Unquestionably the motion to set aside the indictment on grounds of a lack of reasonable or probable cause was properly denied. ▉ Resolving as we must all intendments in favor of the findings of guilt, circumstantial as it may be, we cannot fairly conclude that there is a lack of substantial evidence as to either defendant or as to any count. (See *People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal. Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Love,* 53 Cal.2d 843, 850-851 [3 Cal.Rptr. 665, 350 P.2d 705].)

Both defendants also contend that the court committed prejudicial error in instructing the jury on conspiracy when no conspiracy was charged in the indictments and the prosecution did not indicate that it would try the case as a conspiracy. It is true that there was no count in conspiracy but the court nevertheless fully instructed thereon, not only a first time as a part of its general instructions but also a second time upon request by the jury after it had initially retired. If the giving of such instructions constitutes error

188

the prejudicial effect thereof is manifest where, as in the instant case, a determination as to which of two defendants might have delivered the fatal blow is a difficult one. Furthermore, as will be seen, the question of the admissibility of certain real evidence as to one or both of the defendants depends, in part at least, upon the presence or lack of a conspiracy and the propriety of taking it into consideration.

It must be deemed to be established law that "a conspiracy need not be pleaded in the indictment or information if the evidence actually shows the existence of one. (*People v. Ditson* (1962) 57 Cal.2d 415, 447 [22] [20 Cal.Rptr. 165, 369 P.2d 714] ; *People v. Davis* (1957) 48 Cal.2d 241, 250 [11] [309 P.2d 1] ; *People v. Tanner* (1935) 3 Cal.2d 279, 299 [7] [44 P.2d 324] ; *People v. Wells* (1960) 187 Cal.App.2d 324, 329-330 [12] [9 Cal.Rptr. 384].)'' (*People v. Pike*, 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656].) In the instant case there was evidence that the parties were together in Reno where Mrs. Chapman purchased two guns; that thereafter they remained in each other's company until after the commission of the crimes charged; that immediately before appearing at the victim's bar they departed from another bar upon Mrs. Chapman's conclusion that they were not "going to do anything here"; that they were left in the bar alone with the victim; that they departed from the tavern with the victim under unusual circumstances; that the victim entered their automobile; that while in the automobile the victim was robbed and killed with a gun of the caliber purchased by defendants; that the defendants disposed of his body and went together to a motel. Based on the foregoing and other evidence the jury could reasonably have inferred the existence of a conspiracy between the defendants to commit the crimes with which they were charged (Pen. Code, § 31), and no error is apparent in the giving of an instruction on conspiracy.

Objection is further made that the instruction, as submitted by the prosecution and given by the court made references to the "alleged conspiracy" and the "alleged conspirators." Even if we assume such references were inaccurate it does not appear that any prejudice resulted therefrom. As concluded, the conspiracy, if the jury found it to be a fact, could have been considered in determining the substantive crimes whether or not a conspiracy was alleged, and defendants were found guilty only of the substantive crimes.

Nor is there any merit to defendants' further implication that they were misled by the prosecution's strategy. The People indicated during the trial in open court but out of the presence of the jury that the consequences of the conspiracy would be placed in issue if the evidence justified it.

It is next asserted on the part of the defendant Teale that certain evidence was improperly admitted over objection. He objected to the admission of the gun record in the pawnshop in Reno where Mrs. Chapman made purchases, the check of Mrs. Chapman found near the body, a blue dress with blood stains thereon and the registration card for the motel in Woodland, which she signed. The objection in each instance is based on the claim that none of the exhibits were connected with Teale personally. However, once a conspiracy has been established, evidence of the acts and declarations of the alleged conspirators individually in furtherance of that conspiracy is admissible. (*People* v. *Calhoun*, 50 Cal.2d 137, 143 [323 P.2d 427]; *People* v. *Buckley*, 202 Cal.App.2d 142, 148 [20 Cal.Rptr. 659].)

Teale further contends that because the court at first sustained his objection to the introduction of the registration card he was influenced to waive his right to cross-examine the authenticating witness and that the later admission of the card, in effect, deprived him of his right of cross-examination. While the contention has some basis in theory, Teale was not precluded from recalling the witness had he reason for doing so. In any event he fails to establish the nature of the testimony he might have elicited on cross-examination and in what manner he had been prejudiced by the claimed denial. The error, if any, manifestly was not prejudicial.

Both defendants further contend that the dress referred to above was improperly admitted on the further ground that the People failed to establish a foundation as to the source of the dress. It was confiscated with other clothing in Mrs. Chapman's possession at the time of her arrest in St. Joseph. She admitted at that time that the dress was her property. The impropriety is claimed to exist, however, because the People failed to establish that the dress was in Mrs. Chapman's possession or in the automobile at the time of the homicide. It appears that two cartons of personal effects were shipped to St. Joseph prior to the homicide and the implication thus raised by the objection is that the People should

have established, as part of the foundation, that the dress was not a part of that shipment.

The contention raised does not go to the question of whether the real evidence offered is in fact the identical property confiscated without alteration, or to the integrity of the chain of possession between confiscation and admission into evidence. (See *People* v. *Riser*, 47 Cal.2d 566, 580 [305 P.2d 1]; *People* v. *Nakis*, 184 Cal. 105, 113-114 [193 P. 92]; *People* v. *Lugo*, 203 Cal.App.2d 772, 776 [21 Cal.Rptr. 871].) The significance of the blood stains on the dress was a matter which the jury had the right to consider and it was for the jury to determine as a question of fact from all the evidence whether the dress had been in the automobile at the time of the homicide. (*People* v. *Adamson*, 27 Cal.2d 478, 485 [165 P.2d 3].) The dress tended to throw light on an issue in dispute and the question thus was not its admissibility but rather the weight to be accorded to it. ▪▪▪ Nor was it error, as further claimed by defendants, to exclude their offer of another dress which was claimed to have been worn by Mrs. Chapman on the evening and early morning of the 17th and 18th of October. The relevancy of the dress itself was not demonstrated, and defendants were in no manner foreclosed from disputing the significance of the blood spots on the dress which was put into evidence.

▪▪▪ Defendants next complain that they were not permitted to place before the jury for its determination evidence that the prosecution had failed to comply with a discovery order. It was brought out on cross-examination of a number of the prosecution witnesses that they had been interrogated by police officers who made notes and records of the interview and, in some cases, tape recordings. Such original notes, records and recordings were covered by the discovery order but were not made available to defendants for the stated reason that after the officers' field notes had been transcribed into integrated reports the original notes and records were discarded and tapes erased, in accordance with routine practices of the department.

There is, in fact, no basis for a reasonable belief that the prosecution withheld any information in its possession or otherwise frustrated the defendants. There is no claim that particular *information*, as distinguished from the nature of the recording thereof, has been withheld. The trial court, however, did not let the question of the prosecution's compliance with the discovery order get before the jury, and

advised counsel that the question of compliance was for the court on proper motion in proceedings which were independent of the trial of the causes. It further advised that the question of compliance with discovery was to be distinguished from the suppression or destruction of evidence, which latter matters were pertinent for the jury's consideration.

In this regard the court invited defense counsel to submit evidence of suppression, if any they had, and instructed the jury as follows: "If the People do not present evidence which is available to them which they would naturally be expected to bring before the court, and which is not available to the defendants, you may infer, if it seems reasonable to you to do so, that this evidence would have been unfavorable to the People.

"If you find that any investigating officers wilfully concealed or destroyed evidence in order to prevent its being brought before the court in this trial, you may presume that the evidence, if presented, would have been adverse to the People's case, and you may consider such conduct in determining the merits of their case.

"Note, I do not say that any investigating officers have wilfully concealed or destroyed evidence. This is a question which you must first determine before you may consider the presumption which I have referred to."

The issue raised is a novel one, and we have concluded that the question of compliance with a discovery order is not a matter for the jury's consideration providing, of course, that the jury's right to determine matters bearing on the suppression of evidence is not restricted. As stated, the record presents no ground for a reasonable belief of misconduct on the part of the prosecution in the instant case. (See *People* v. *Kroeger*, 61 Cal.2d 236, 246-247 [37 Cal. Rptr. 593, 390 P.2d 369].)

The court did not give an instruction on second degree murder or manslaughter, and instructed that defendants were either not guilty of murder at all or were guilty of murder of the first degree. It must be presumed that defendants, if guilty of murder of the first degree, were guilty under the felony murder doctrine, as no instructions on premeditation and deliberation were given. (Pen. Code, § 189.) Thus, the jury was instructed, in effect, that if it found defendants committed the unlawful killing then it must fur-

ther find that the killing occurred in the perpetration of a robbery. That a robbery had been committed is uncontroverted and appears as a matter of law.

The defendant Teale's only defense was a denial of the commission of the homicide. (See *People* v. *Turville,* 51 Cal. 2d 620, 633 [335 P.2d 678]; *People* v. *Imbler,* 57 Cal.2d 711, 715 [21 Cal.Rptr. 568, 371 P.2d 304].) Mrs. Chapman, in addition to a denial, submitted evidence tending to show that she lacked mental capacity to form the requisite intent. However, such testimony was to the effect that she suffered from a "disassociative reaction"; that when she found herself in an uncontrollable situation she would " 'black out' by simply not knowing."

Defendants, who did not request an instruction on second degree murder or manslaughter, now complain that the court should have given such instructions on its own motion, and that the same were required on the theory that the homicide occurred in the perpetration of a felony other than one of those mentioned in section 189 of the Penal Code, that is, simple kidnaping. Thus, it is claimed, that since the jury found a simple kidnaping as well as the robbery had occurred such additional criminal act made it incumbent upon the court to instruct on second degree murder.

The foregoing contention is obviously without merit. Where, as here, the evidence compels a conclusion that a murder, if committed at all, was committed in the perpetration of a robbery and for that reason is murder of the first degree, it does not follow that if it further appears that such murder was committed in the perpetration of robbery *and* simple kidnaping it now becomes murder of the second degree. The fact that a second, lesser homicide has *also* been committed does not require instructions thereon where, conceding the homicide, the greater offense appears as a matter of law. The only real question before the jury was thus whether defendants were the perpetrators of the homicide.

It is contended that, at least as to Mrs. Chapman, her crime might have been manslaughter because she could not have entertained the specific intent to murder, but might have entertained the lesser intents associated with involuntary manslaughter. (See *People* v. *Modesto,* 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33].) But an objective evaluation of the defendant's evidence as to her mental capacity does not permit a reasonable conclusion that she could not have acted with "malice aforethought" (Pen. Code, § 187), and at the

same time have entertained an intent to commit an "unlawful act, not amounting to a felony" or a lawful act "in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192.) According to her expert witness' testimony she did not have the mental capacity to commit any crime. Hence, the jury was properly instructed that defendants were guilty of murder of the first degree or were not guilty of the unlawful commission of any homicide.

Error is claimed by Mrs. Chapman in instructions given on the effect which intoxication of an accused may bear on the question of specific intent where such intent is an element of the crime charged.[1] The challenged instructions are similar to those condemned in *People* v. *Spencer,* 60 Cal. 2d 64, 86-87 [31 Cal.Rptr. 782, 383 P.2d 134]. Although further instructions which immediately followed properly stated the law, and, as in *Spencer,* "it appears that upon rather elaborate analysis a correct understanding of the relevant law can be gleaned from the instructions construed as a whole," nevertheless it was error to burden the jury with the confusing and contradicting instructions in such circumstances. However, for the reasons which follow, the error was harmless.

As in *Spencer,* the evidence of the defendant's intoxication was minimal and for that reason the erroneous instruction must be deemed nonprejudicial. (*People* v. *Spencer, supra,* 60 Cal.2d 64, 87.) Moreover, the defendant did not rely on intoxication in the ordinary sense. Her defense was that due to her emotional instability, coupled with the presence of alcohol in her system, she "blacked out" and suffered a complete mental disassociation. This theory was fully exploited by the defendant and in such circumstances the instant error on the effect of intoxication on ability to form a specific intent was not prejudicial.

Defendant Chapman next claims that an instruction relating to confessions and admissions was not applicable to

---

[1]The portion of the instructions objected to were as follows: "Our law provides that no act committed by persons while in a state of voluntary intoxication is less criminal by reason of his or her having been in such condition. This means that such a condition, if shown by the evidence to have existed in the defendants at the time when allegedly they committed the crimes charged, is not of itself a defense. It may throw light on the occurrence and aid you in determining what took place; but when a person in a state of intoxication, voluntarily produced in himself, commits a crime, the law does not permit him to use his own vice as a shelter against the normal, legal consequences of his conduct."

her, as she personally had made no such statements, and that it was prejudicial error to not so instruct the jury. In *People* v. *Burns,* 114 Cal.App.2d 566 [250 P.2d 619], it was held to be reversible error as to a nonconfessing defendant to fail to limit an instruction on confessions to his confessing co-defendant. (See also, *People* v. *Wade,* 185 Cal.App.2d 226 [8 Cal.Rptr. 197].)

While it is true that the instruction on confessions and admissions was couched in general terms and, standing alone, would reasonably be construed to apply to Mrs. Chapman as well as Mr. Teale, it further appears that other instructions negated the error, if any, in the circumstances here prevailing. Moreover there was evidence of statements made by Mrs. Chapman, probably not amounting to admissions, which were testified to during the trial. Mrs. Chapman also made several statements which constituted admissions but which were not put into evidence. Nevertheless, constant references were made to such statements by the various psychiatrists who testified, and defense counsel argued vigorously for the admission of an exhibit consisting of an 84-page statement by Mrs. Chapman. In each instance where a statement by Mrs. Chapman was referred to by a psychiatrist witness, the jury was admonished that the statement was not to be received as proof of the matters asserted, but only as going to the basis upon which the doctor had formulated his opinions. In addition the court instructed the jury at the close of the trial as follows: ''During the course of this trial, psychiatrists have testified concerning the mental and emotional condition of defendant Ruth Chapman. During their testimony they related certain statements made by Mrs. Chapman to them. These statements were not evidence of the facts related, but were admissible only as they explained or formed a basis for the expert opinion of the psychiatrists concerning the mental and emotional condition of defendant Ruth Chapman.''

It must be deemed, in view of the foregoing, that the jury was not misled as to those statements of Mrs. Chapman not received in evidence. As to extrajudicial statements which were received in evidence, the court instructed as follows immediately preceding the general instructions on confessions and admissions: ''Where evidence has been received against one of the defendants but is not received as against the other, the jury may consider such evidence only as against the defendant against whom it was permitted to be

received. It may not be considered by the jury for any other purpose, or against the other defendant.

"In the trial of this case, there were instances when certain evidence was admitted as against one of the defendants, but denied admission as against the other.

"Your attention was called to these matters when the rulings were made. But I would urge you again to keep in mind the distinctions pointed out in such rulings, and their effect. It may be difficult for you, when considering the case for or against any one defendant to completely disregard any evidence that you have heard or seen, but that is your plain duty with respect to evidence not admitted by the court as against that defendant, and you must try conscientiously to so treat such a situation.

"Where evidence has been received of a statement of a defendant after his or her arrest and in the absence of his codefendant, such statements can be considered only as evidence against the defendant who made such statement and cannot be considered for any purpose as evidence against the codefendant.

"If in this trial any evidence has been received of a statement or admission of Thomas Leroy Teale after his arrest and in the absence of his codefendant, such statement can be considered only as evidence against Mr. Teale and cannot be considered for any purpose as evidence against Ruth Elizabeth Chapman.

"Likewise any evidence of a statement or admission of Ruth Elizabeth Chapman after her arrest and in the absence of her codefendant can be considered only as evidence against Mrs. Chapman and cannot be considered for any purpose as evidence against Thomas Leroy Teale."

In view of the foregoing specific instructions immediately preceding the general instructions on admissions and confessions we are persuaded to the conclusion that the jury reasonably could not have applied either Mrs. Chapman's excluded extrajudicial statements or the admissions which the defendant Teale made to his fellow inmate in determining the individual guilt of Mrs. Chapman.

No contention is made that any of the extrajudicial statements were received in evidence in violation of defendants' right to counsel as enunciated in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and

*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and it otherwise does not appear that defendants' rights in this regard have been infringed. In any event, aside from Teale's statement to his fellow inmate, which clearly falls outside the proscription of *Escobedo, Massiah* and *Dorado,* the admission of other statements could not have resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

As stated, neither defendant testified in his or her own behalf in the exercise of their constitutional privilege. The prosecuting attorney, during his summation to the jury, commented on numerous occasions regarding the failure of either defendant to explain certain factual matters established by independent evidence. Such comments went to the motives for the procurement and handling of guns purchased by Mrs. Chapman, funds or the lack thereof in Mr. Teale's possession immediately prior to the killing, the amount of intoxicating liquors consumed by defendants at the Spot Club and other taverns, the circumstances of the shooting in the automobile and the removal of the victim's body therefrom, who fired the fatal shots, why defendants used a false registration at a motel shortly after the killing, the meaning of a letter written by Mrs. Chapman several days after the killing, why Teale had a loaded weapon in his possession when apprehended, the meaning of statements made by Teale after his apprehension, why certain clothing and articles of personal property were shipped by defendants to Missouri, what clothing Mrs. Chapman wore at the time of the killing, conflicting statements as to Mrs. Chapman's whereabouts immediately preceding the killing and, generally, the overall commission of the crime. In addition to the foregoing the court, in instructions to the jury and in accordance with the California Constitution provision (Cal. Const., art. I, § 13), stated, among other things, that the failure of defendants to testify from facts within their knowledge in explanation of incriminating evidence, may be deemed as tending to indicate the truth of such incriminating evidence and "that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable."

The foregoing comments and instructions have been ruled in violation of the Fifth and Fourteenth Amendments (*Griffin* v. *California,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], *Malloy* v. *Hogan,* 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653]), but the question remains whether in any particular instance the error in allowing such comments and in

giving such instruction has resulted in a miscarriage of justice requiring a reversal of the judgment of conviction. (*People* v. *Bostick,* 62 Cal.2d 820, 823-827 [44 Cal.Rptr. 649, 402 P.2d 529].)

It clearly appears that the error in allowing the comments and in giving the improper instruction could not have resulted in a miscarriage of justice as to the defendant Teale. While he may not have confessed to the crime, nevertheless the admissions which he made to his fellow inmate are so damaging that, when considered with the other substantial evidence, the proof of his guilt must be deemed overwhelming. His statements, of course, were not admissible against the defendant Chapman. Nevertheless the persuasive, circumstantial web of evidence which implicated her was not refuted, and the only real defense which she urged at the trial level was her claimed inability to form a criminal intent, which she sought to establish through expert witnesses. The comments and instruction on her failure to explain away the circumstantial web of evidence become of less significance in view of the defense's complete failure to refute such evidence by any means whatsoever. That evidence, in effect, stands unchallenged and the prosecutor's and court's remarks add little to its stature. Moreover, we are unable to discern what bearing, if any, the remarks would have on the defense of an inability to form the requisite intent, as interposed by Mrs. Chapman. This being a technical defense based upon expert opinion, comments on her failure to testify could not be material thereto. In view of the almost complete failure to submit *any* rebuttal, the comments and instruction added little which was not already apparent to the jurors, that is, the defendants were not disposed to question the truth of the facts asserted by the prosecution's witnesses.

We are therefore of the opinion that in the absence of the erroneous comments and instructions a result more favorable to defendants was not reasonably probable in view of the entire record (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), and that there has been no miscarriage of justice as to either Mrs. Chapman or Mr. Teale.

 Contention is also made by the defendant Teale that prejudicial error occurred in the penalty phase in the court's instructions, and the prosecutor's arguments going to the role played by the Adult Authority in fixing parole for those convicts sentenced to life terms. (*People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33].) However, the instruc-

tions and arguments fall far short of those condemned in *Morse*.

The instruction to which exception is taken is as follows: "Further the law of this state provides that every person guilty of murder of the first degree shall suffer death or confinement in the state prison for life with the possibility of parole." And the language of the prosecutor to which particular objection is taken is as follows: "For example, if you feel that a term in prison, for example —, with all of the facilities for rehabilitation and so forth, would insure, insofar as human reason can infer, that these defendants, even if they are ultimately and they will be one day perhaps—there is a possibility if they are—the death penalty is not invoked, possibly they may be paroled.—They may not be, but again they may be. It is the law."

The jury was not advised of the role which the Adult Authority plays, the conditions under which parole is granted, statistical information relative to past and current practices in granting parole, or any of the other matters condemned in *Morse* as improper for the jury to consider. Insofar as appears the jury was advised only that a convict undergoing a life sentence might someday be paroled and the further obvious inference might be drawn from the prosecutor's remarks that if the death penalty is invoked there is no possibility of parole. Manifestly, the invitation to the jury to speculate and surmise as to the improper release of a defendant to society in the future if a life instead of a death sentence is imposed, upon which *Morse* turned, is completely lacking in the instant case.

As the evidence clearly indicates that all of the crimes charged and of which Mrs. Chapman stands convicted are inseparable, she was improperly sentenced for all three counts. (*People* v. *McFarland*, 58 Cal.2d 748 [26 Cal.Rptr. 473, 376 P.2d 449]; *People* v. *Houston*, 219 Cal.App.2d 187 [33 Cal.Rptr. 26].) Thus the judgment, insofar as it imposes punishment for robbery and kidnaping, the lesser crimes, must be reversed as to Mrs. Chapman. As the death penalty was imposed on the defendant Teale he is not affected by the multiple sentencing. (*People* v. *Seiterle*, 59 Cal.2d 703, 712 [31 Cal.Rptr. 67, 381 P.2d 947].)

The judgment is reversed insofar as it imposes sentences for robbery and kidnaping on Mrs. Chapman, and in all other respects is affirmed. The judgment as to the defendant Teale is affirmed in all respects.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Schauer, J.,* and Dooling, J.,* concurred.

Appellants' petition for a rehearing was denied August 27, 1965, and the opinion was modified to read as printed above. Schauer, J.,* sat in place of Mosk, J., who deemed himself disqualified.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.